IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | | |
|---|---|---|
| SABINE SIMMONS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | 2:18cv640-MHT |
| | ) | (WO) |
| ALABAMA STATE UNIVERSITY | ) | |
| and LEON C. WILSON, | ) | |
| | ) | |
| Defendants. | ) | |

OPINION AND ORDER

Plaintiff Sabine Simmons brings multiple federal
claims against defendants Alabama State University
(ASU) and former ASU Interim President Leon C. Wilson,
in his individual capacity, asserting retaliation in
violation of Title VII of the Civil Rights Act of 1964,
as amended, 42 U.S.C. §§ 1981a, 2000e-2000e-17; race
discrimination in violation of 42 U.S.C. § 1983; and
retaliation in violation of the Family and Medical
Leave Act (FMLA), 29 U.S.C. §§ 2601-2654.  Simmons
brings the Title VII claim against ASU, the § 1983
claim against Wilson, and the FMLA claim against both.

The court has jurisdiction over Simmons's claims pursuant to 42 U.S.C. § 2000e-5(f)(3) (Title VII), 29 U.S.C. § 2617 (FMLA), and 28 U.S.C. § 1331 (federal question). The case is now before the court on ASU and Wilson's motion for summary judgment. For the reasons described below, defendants' the motion will be granted in part and denied in part.


I. SUMMARY-JUDGMENT STANDARD

"A party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must view the factual allegations in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. *See Matsushita Elec. Indus.*

2

*Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). If no reasonable jury could return a verdict in favor of the nonmoving party, there is no genuine issue of material fact, and summary judgment is appropriate in favor of the moving party. *See Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 459 (11th Cir. 1994).

## II.   FACTUAL BACKGROUND

Simmons worked in the Health Information Management (HIM) department of ASU's College of Health Sciences. She began there in 2008 on a temporary contract, which was renewed each year until its nonrenewal in 2017. She was supervised by Dr. Cheryl Easley, then Dean of the College of Health Sciences; Dr. Karyn Scissum Gunn, then Interim Provost and Vice President of Academic Affairs (who also supervised Easley); and, for part of her stint, Dr. Bridgette Stasher-Booker, who served as interim HIM department chair beginning in September

2016.  Wilson was ASU Interim President during the relevant period.

Simmons's allegations describe a series of interactions between her and other ASU staff members. The court's consideration of the current record, taking all inferences in favor of plaintiff, yields the following timeline:

- Simmons was appointed to a nine-month temporary role in the HIM department in September 2008.  Her contract was renewed annually, each time for 12 months, through the 2016-17 academic year.  In May 2014, she became an Assistant Professor.  Simmons is black.

- In the spring of 2016, Amy Hinton, who had previously worked at ASU in other capacities, was hired as a full-time "Probationary Assistant Professor" in the HIM department.  Hinton is white.

- In August 2016, Dean Easley recommended that Hinton's contract be nonrenewed; the recommendation

was followed.

- In September 2016, the chair of the HIM department was placed on administrative leave, and Booker was named interim chair that same month.

- In October or November 2016, after Hinton's contract was nonrenewed, Simmons informed Hinton that Booker had been making disparaging comments, including some involving race, about Hinton. Around this same time, Simmons states, she informed Booker that she did not feel comfortable participating in those conversations. *See, e.g.*, Dep. of Amy Hinton (Doc. 63-4) at 171–172 ("Dr. Simmons told me that she asked Dr. Booker to stop ....").

- In late October 2016, Simmons received a warning regarding her practice of forwarding her office phone to her cell phone during work hours. The warning led to a weeks-long dispute in which Simmons argued that the underlying "policy" did not

exist and was merely an effort to frustrate her. *See, e.g.*, Pltf.'s Email to Easley (Doc. 63-10) at 4. Simmons eventually reported to ASU that Booker's "persistence" was becoming "harassing." Pltf.'s Resp. (Doc. 63) at 5.

- In the fall of 2016, after Simmons expressed discomfort with Booker's disparaging comments, ASU police were called on Simmons, apparently because she had parked in a non-assigned parking spot. Simmons was "visibly upset" afterwards. Dep. of Amy Hinton (Doc. 63-4) at 171-172.

- In early January 2017, Simmons and Booker engaged in a heated email exchange regarding student internships. *See* Email Exchange (Doc. 50-13). Among other things, Booker requested that plaintiff "maintain[]" "proper and professional etiquette" with regard to email exchanges, noting that further similar behavior would result in "disciplinary action." *Id.* at 2.

- On January 25, 2017, Simmons filed a grievance with the ASU Office of Human Resources.  She asserted that Booker's repeated insistence regarding her phone forwarding was creating a hostile-work environment.  *See* Employee Grievance (Doc. 63-10) at 10.  The grievance detailed several alleged "acts of harassment," including being told that "when I tell you to un-forward your phone, you better just do it," *id.* at 15; being asked why she reported to work late, *id.*; being reprimanded for being late to a meeting that she claimed she was not informed about, *id.* at 15-16; and Booker's "[b]erating other faculty" to Simmons, including calling various colleagues "White Bitches," *id.* at 16.  The grievance listed Hinton as a witness, *id.* at 12, and described several problems between Hinton and Booker.

- On January 29, 2017, Simmons informed Booker that she (Simmons) would be taking FMLA leave.

- In February 2017, Hinton filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC), indicating in the relevant questionnaire that Simmons may have been treated in a similar discriminatory fashion.

- On April 13, 2017, Interim Provost Gunn sent a letter to Simmons indicating that her temporary contract would not be renewed. The letter described "recommendations from your college administrators that preclude any reappointment considerations for the next academic year."[1] Letter (Doc. 50-15) at 1.

- In late April 2017, Gunn received a memorandum from Easley. The memorandum recommended placing Simmons on paid administrative leave until the expiration

---

1. As clarified at oral argument, similar letters are sent to many temporary or probationary employees as a matter of course; those employees may then be re-hired for a subsequent term. In contrast, and as noted above, the letter from Gunn to Simmons specifically referenced concerns that precluded reappointment.

of her contract, including because she had become "rather disgruntled" after not being named interim chairperson in September 2016. Easley Memorandum (Doc. 50-17) at 1.

- In September 2017, Simmons filed a charge of discrimination with the EEOC, asserting that she was retaliated against after supporting Hinton.

### III.  ANALYSIS

### A. Title VII Claim

Title VII makes it unlawful for an employer to retaliate against an employee or prospective employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). Any action by an employer that might "dissuade[] a reasonable worker from making or

9

supporting a charge of discrimination" qualifies as unlawful retaliation. *Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 174 (2011) (quoting *Burlington N. & Sante Fe Ry. v. White*, 548 U.S. 53, 68 (2006)).

Retaliation claims under Title VII may proceed down one of two paths: an employee is fired to retaliate *against another employee*, or an employee is fired to retaliate against her *for her own statements or actions*. The former is known as "third-party retaliation" because the retaliation is not a response to a statement or action by the employee who suffers the adverse employment action; it aims to punish someone else. Still, the person who suffers the adverse employment action may bring a Title VII claim. *See Thompson*, 562 U.S. at 178 ("[I]njuring him was the employer's intended means of harming [her, the complaining employee]. Hurting him was the unlawful

act by which the employer punished her.").[2]

These two paths require distinct showings because they hinge on protected activity by different people. To succeed on a third-party retaliation claim, Simmons must show that she had a 'relationship' with Hinton and that *Hinton* engaged in statutorily protected expression; that the employer took an adverse action against her (Simmons); and that *Hinton* was the but-for cause of the employer's adverse action against Simmons. *See id.* at 175; *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013) (discussing the but-for requirement for retaliation claims).  In contrast, if Simmons alleges that the retaliation occurred in response to *her own protected activity*, she must show "(1) that *she* engaged in statutorily protected expression; (2) that *she* suffered an adverse employment

_____

2.  In *Thompson*, the plaintiff sued after his fiancée filed a discrimination charge with the EEOC and the employer fired Thompson, who also worked there. His firing was allegedly a response to *her* protected expression.  *See Thompson*, 562 U.S. at 178.

action; and (3) that there is some causal relation between the two events." *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1363 (11th Cir. 2007) (emphasis added).

Simmons's motion and briefing confuse these two theories. In her complaint, she alleges that she was retaliated against "in retaliation for her co-employee having complained of race discrimination and she affirmatively attest[ed] to the same." Complaint (Doc. 1) at 2. The complaint later states that she "was terminated in retaliation *for her being supportive* of a white co-employee's allegations ...." *Id.* at 9 (emphasis added). That is, in the complaint, Simmons asserts that she was retaliated against because she made statements of support for Hinton.[3]

_____

3. The court assumes, but does not decide, that Simmons' reported statements to Booker--for example, when she said that she was uncomfortable with Booker's derogatory language regarding Hinton--suffice to establish that Simmons engaged in statutorily protected expression. Because Simmons's Title VII claim is otherwise due to be dismissed regardless of the theory of retaliation, the court need not reach this issue.

In her briefing, however, Simmons very clearly describes *third-party* retaliation: she alleges that she was retaliated against because she was "[c]losely [r]elated" to Hinton. Such a theory understands Simmons's firing as an instance of retaliation *against Hinton*. Simmons devotes substantial ink to her "close relationship" with Hinton,[4] and she discusses Hinton's "statutorily protected expression" at length. *See, e.g.*, Pltf.'s Resp. (Doc. 63) at 20-21; *id.* at 23 ("Clearly the facts establish Hinton engaged in Statutorily Protected Expression.").

Under either theory of the claim, however, at least

_____

4. To establish third-party retaliation under Title VII, a plaintiff must establish a 'relationship' between herself and the party being retaliated against. The Supreme Court has declined to "identify a fixed class of relationships for which third-party reprisals are unlawful." *Thompson*, 562 U.S. at 175; *see also id.* at 174 ("Perhaps retaliating against an employee by firing his fiancé would dissuade the employee from engaging in protected activity, but what about firing an employee's girlfriend, close friend, or trusted co-worker?"). Here, this court does not reach the question of whether the relationship between Simmons and Hinton qualifies under *Thompson* and *Burlington*, as Simmons's claim would not succeed in any case.

part of Simmons's burden is the same: she must demonstrate that the otherwise-legitimate reasons given by ASU for her firing were merely pretext for retaliation. Because Simmons has not met this burden, her Title VII claim, under either legal theory, cannot prevail.

When a Title VII retaliation claim is based on circumstantial evidence, the Eleventh Circuit utilizes a three-part burden-shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Kidd v. Mando Am. Corp.*, 731 F.3d 1196, 1202 (11th Cir. 2013). First, the plaintiff must establish a prima-facie case of retaliation, which raises a presumption that the defendant's decision was likely to be based upon an impermissible factor. *See, e.g.*, *Johnson v. Miami-Dade Cty.*, 948 F.3d 1318, 1325 (11th Cir. 2020). Then, the burden shifts to the defendant to offer a legitimate, nonretaliatory reason for its decision. *See id.* Finally, if the defendant offers a

**14**

legitimate, nonretaliatory reason for its employment decision, the burden shifts back to the plaintiff to establish that the reason offered by the defendant was not the real basis for the decision, but a pretext for retaliation. *Id.* Accordingly, to establish Title VII retaliation, a plaintiff must show "that the reasons given for an adverse action were a pretext for retaliation and that retaliation was the but-for cause of the adverse action." *Parten v. Alabama Dep't of Tourism*, 100 F. Supp. 3d 1259, 1271 (M.D. Ala. 2015) (Thompson, J.); *see also Nassar*, 570 U.S. at 362.

Here, the court need only consider the final issue: pretext. *See generally Lewis v. Eufaula City Bd. of Educ.*, 922 F. Supp. 2d 1291, 1298–99 (M.D. Ala. 2012) (Thompson, J.) (noting that the preceding steps of the framework "[o]ften" become "irrelevant" at summary judgment).[5] "[T]o establish pretext at the summary

_____

5. As a result, the court does not make any finding regarding the first two steps of the burden-shifting framework.

judgment stage, a plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Gogel v. Kia Motors Mfg. of Georgia, Inc.*, 967 F.3d 1121, 1136 (11th Cir. 2020) (*en banc*) (quotation marks and citation removed). A "reason is not pretext for [retaliation] unless it is shown *both* that the reason was false, *and* that [retaliation] was the real reason." *Id.* at 1136 (citing *Springer v. Convergys Customer Mgmt. Grp. Inc.*, 509 F.3d 1344, 1349 (11th Cir. 2007)) (alterations and emphasis in original) (quotation marks omitted); *see also Tolar v. Bradley Arant Boult Commings, LLP*, 997 F.3d 1280, 1298 (11th Cir. 2021). Finally, and importantly, the "employee cannot succeed by simply quarreling with the wisdom of [the employer's] reason." *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000).

16

Simmons asserts that the reasons given for her nonrenewal serve only to mask ASU's retaliatory intent. Her strongest argument seems to be that the stated reasons for her nonrenewal emerged (or, at minimum, were documented) *after* she voiced her opposition to Booker's alleged derogatory comments about Hinton, and even then with a flimsy basis--and, therefore, that they must have been manufactured to oust her. As to her forwarding her phone, for instance, she contends that ASU's concerns emerged only once she supported Hinton and without the backing of a formal school policy. *See, e.g.*, Pltf.'s Email to Easley (Doc. 63-10) at 4. The record does confirm that no school-wide policy existed, despite Booker's persistence on the matter. *See, e.g.*, *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 926 (11th Cir. 2018) (noting, as evidence supporting an allegation of pretext, that an employee was reprimanded for issues that had never been a problem for other employees). Moreover, Hinton

**17**

expressed her belief that co-workers behaved differently towards Simmons beginning after she voiced her support for Hinton. *See* Dep. of Amy Hinton (Doc. 63-4) at 172.

But the record reveals a substantial list of frustrations that built over months until Simmons's nonrenewal: Simmons's declining to change her phone-forwarding practices even after the Interim Chair Booker told her, firmly and repeatedly, to do so; her general frustrated demeanor after she was passed over for an interim promotion; a combative email that was deemed a serious breach of email etiquette and prompted an apology. Even without a formal policy behind the warnings, Simmons had ample notice that her behavior irritated, and sometimes offended, others in the HIM department. Simmons does not deny these actions. *Cf. Jackson v. State of Alabama State Tenure Comm'n*, 405 F.3d 1276, 1290 (11th Cir. 2005) ("The letters are in the record and they shout for themselves."). Rather,

she denies that they are substantial enough to stand on their own.   But that argument speaks primarily to the reasons' wisdom, not their sincerity.[6]

Simmons also correctly notes that the concerns that led to her firing were documented only after she voiced support for Hinton.   But they also occurred right after Simmons was passed over for a promotion--at which point she became "rather disgruntled" and "very difficult ... to supervise"--and right after Booker took over as interim chair.   Memorandum (Doc. 63-10) at 73; *see also* Affidavit of Dr. Cheryl Easley (Doc. 50-9) at 1 ("After the announcement was made that Dr. Booker would be the interim department chair, Dr. Sabine Simmons visited my

---

6.   Simmons also expressed her opinion that forwarding her office phone made her better at her job, not worse.   But her supervisor obviously disagreed, told her as much, and repeatedly asked her to change it.   In such a circumstance, "the question is not whether the plaintiff's performance was *actually* poor, but whether the employer believed the plaintiff's performance was poor."   *Rawls v. Alabama Dep't of Hum. Res.*, 507 F. App'x 895, 900 (11th Cir. 2013) (unpublished).   In any event, Simmons's different view on the issue gave her no right to be insubordinate.

19

office wanting to know why she was not named the
interim department chair."). Moreover, Simmons's
nonrenewal came at least five months after she voiced
her concerns to Booker regarding her language about
Hinton; this "lag in time between her internal
complaints and her termination undermines her claim of
a but-for causal relationship." *Parten*, 100 F. Supp.
3d at 1271 (granting summary judgment in the context of
a one-year gap). Finally, there is no evidence to
suggest any procedural irregularity in Simmons's
nonrenewal: the evidence indicates that ASU's
procedures were followed and that ASU's motivating
reasons were clearly articulated, including in the form
of warnings that occurred several months before
Simmons's nonrenewal (and, therefore, while she still
had a chance to adjust her behavior). *See generally
Jefferson*, 891 F.3d at 926; *Hurlbert v. St. Mary's
Health Care Sys., Inc.*, 439 F.3d 1286, 1298 (11th Cir.
2006) (noting that "an employer's failure to articulate

20

clearly and consistently the reason for an employee's discharge may serve as evidence of pretext").

Of course, the lack of a school-wide policy regarding phone forwarding does not necessarily mean it is an illegitimate reason, particularly because Booker clearly emphasized her own policy to Simmons. And there is nothing in record to indicate that Booker herself could not set such a policy, regardless as to whether the school also had such a policy. *Cf. Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1363 n.3 (11th Cir. 1999) ("An employer who fires an employee under the mistaken but honest impression that the employee violated a work rule is not liable for discriminatory conduct."). Moreover, that Simmons disagreed with the policy did not give her right to disobey it. Even her right to challenge the policy in this court did not give her the right to be insubordinate while employed at ASU.

Most importantly, the evidence--even when viewed in

the light most favorable to Simmons--demonstrates that the relevant decisionmakers, Easley and Gunn, based their decision to nonrenew Simmons on reasons that they identified on their own. Put simply, Booker was not alone in finding Simmons's behavior troubling. Easley, for instance, wrote that her nonrenewal recommendation was "based ... upon Dr. Simmons' attitude after not receiving the interim appointment." Affidavit of Dr. Cheryl Easley (Doc. 50-9) at 2:5. Though she did reference Simmons's phone-forwarding practices, Easley concluded that "[t]he recommendations that I made ... were based upon the attitude that Simmons displayed in the workplace. It had nothing to do with any allegations of discrimination or support for allegations of discrimination or retaliation for supporting allegations of discrimination." *Id.* at 3:8. Indeed, Booker denied any involvement in the recommendation that Simmons be nonrenewed, and there is nothing in the record to the contrary. *See* Dep. of

Bridgette Booker (Doc. 50-11) at 107:7-9 ("Q: So you had nothing to do with the recommendation of [Simmons] being nonrenewed when you were interim chair in 2017? A [Booker]: No, no, no, didn't."). Also, there is no evidence in the record that Gunn and Easley were pawns for Booker. As the Eleventh Circuit has noted, "if ... a decisionmaker conducts its own evaluation and makes an independent decision, the decision is free of the taint of a biased subordinate employee." *Wood v. Calhoun Cty. Fla.*, 626 F. App'x 954, 956 (11th Cir. 2015) (unpublished) (citing *Pennington v. City of Huntsville*, 261 F.3d 1262, 1270-71 (11th Cir. 2001)). No record evidence indicates that Gunn or Easley were motivated primarily by Booker's reports--or were even aware of Simmons's support for Hinton prior to Simmons's nonrenewal.

In light of the array of reasons set forth by Easley and Gunn, including several that were observed independently, Simmons has not produced sufficient

evidence to "demonstrate the existence of a genuine
issue of fact as to the truth of each of the employer's
proffered reasons for its challenged action." *Combs v.
Plantation Patterns*, 106 F.3d 1519, 1529 (11th Cir.
1997); *see also Blevins v. Heilig-Meyers Corp.*, 52 F.
Supp. 2d 1337, 1348 (M.D. Ala. 1998) (Thompson, J.),
*aff'd*, 184 F.3d 825 (11th Cir. 1999) ("Because Blevins
has not shown that the other reason proffered by
Heilig-Meyers to explain their decision was pretextual,
she cannot prevail."). Even taking all inferences in
favor of Simmons, therefore, the record does not
support a finding that ASU's reasons for Simmons's
nonrenewal were pretextual. Simmons has "necessarily
failed" to meet her burden. *Gogel*, 967 F.3d at 1138.
Accordingly, summary judgment is warranted in favor of
ASU on Simmons's Title VII claim.


## B. Section 1983 Claim

Simmons also asserts a § 1983 claim against former

**24**

ASU Interim President Wilson in his individual capacity. The claim is both insufficiently alleged and lacking evidentiary support; accordingly, summary judgment is due to be granted.

First, Simmons's claim is not adequately asserted in the complaint. Section 1983 is not itself a source of substantive rights; it is a vehicle for the *enforcement* of rights that are conferred elsewhere. *See, e.g.*, *Albright v. Oliver*, 510 U.S. 266, 271 (1994). Accordingly, "[t]he first step in any such claim is to identify the specific constitutional right allegedly infringed." *Id.* But Simmons's complaint does not make clear what right she is seeking to vindicate: she offers no substantive basis for her claim besides a general reference to the "laws of the United States." Complaint (Doc. 1) at 10. This omission renders the complaint insufficient.

Even a generous read of the complaint does not save Simmons's § 1983 claim. For instance, the relevant

part of the complaint does technically incorporate the preceding allegations, including those in the Title VII cause of action--implying some connection between them. *See id*. But if the underlying allegation is based upon Title VII, then Simmons's complaint is once again insufficient: "an allegation of a Title VII violation cannot provide the sole basis for a § 1983 claim." *Arrington v. Cobb Cty.*, 139 F.3d 865, 872 (11th Cir. 1998); *Charles v. Scarberry*, 340 F. App'x 597, 600 (11th Cir. 2009).[7] That is, while a Title VII claim does not necessarily *preempt* a constitutional cause of action, *see Dickerson v. Alachua Cty. Comm'n*, 200 F.3d 761, 766 (11th Cir. 2000), it is also not enough to support a § 1983 claim by itself. And if the claim asserts a violation of the First or Fourteenth Amendments, it is certainly not alleged in the

---

7. *Arrington* provides a useful counterexample, demonstrating what is missing from Simmons's claims. There, the plaintiff did not rest her § 1983 claim on an alleged violation of Title VII; rather, she alleged a violation of her Fourteenth Amendment right to equal protection. *See Arrington*, 139 F.3d at 872.

complaint, which does not mention them (or any other amendment) at all.

Simmons tries to fill in the gaps in her reply brief. *See, e.g.*, Pltf.'s Resp. (Doc. 63) at 44 (asserting that the § 1983 claim is based on the "Fourteenth Amendment Equal Protection Clause and her right not to be retaliated against after having engaged in statutor[ily] protected activity ...."). But the effort comes too late: Simmons's complaint does not contain a "short and plain statement of the claim," Fed. R. Civ. P. 8(a)(2), and thereby does not "give the defendant fair notice of what the ... claim is and the grounds upon which it rests," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). And "[a] plaintiff may not amend her complaint through argument in a brief opposing summary judgment." *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004). The claim is not properly alleged, and summary judgment is due to be granted. *See Burkette v. Montgomery Cty. Bd. of*

*Educ.*, 2008 WL 5114313, at *4 (M.D. Ala. 2008) (Watkins, J.) (approving a Magistrate Judge recommendation that concludes that "Burkette makes no reference to the Fourteenth Amendment in his Complaint and thus the Court must conclude Burkette rests his § 1983 claim solely on his Title VII claims," and therefore that "summary judgment must be granted as to the § 1983 claims"); *see generally Cogswell v. Hansell*, 2010 WL 3069118, at *1 (M.D. Fla. 2010) (Presnell, J.).

In the alternative, to the extent that the court *can* discern a substantive claim in the complaint, it is (as counsel for Simmons asserted during oral argument at the pretrial conference) for unlawful 'race discrimination' in violation of the Fourteenth Amendment to the United States Constitution, levied against Wilson in his individual capacity. But this claim lacks any support in the record. As a threshold matter, even assuming that Simmons's legal theory--that she was nonrenewed because she supported or befriended

28

a white employee--there is no evidence on the record that Wilson was aware of the ongoing conflicts involving Simmons, Booker, and Hinton; that he considered them at all; or that Booker's alleged animus influenced his decision. Because "a supervisor cannot be held liable on the basis of respondeat superior for the acts of his inferiors under section 1983," *Busby v. City of Orlando*, 931 F.2d 764, 782 (11th Cir. 1991), this lack of evidentiary support dooms Simmons's claim. For this reason, too, summary judgment is due to be granted in favor of Wilson on the § 1983 claim.

### C. FMLA Claim

Left to be considered, then, is Simmons's final claim: her third claim for retaliatory discharge in violation of the FMLA. *See* Complaint (Doc. 1) at 11 (alleging FMLA violation).

ASU and Wilson's motion for summary judgment and accompanying brief do not mention this claim. *See,*

29

*e.g.*, Br. in Support of MSJ (Doc. 49) at 1 ("The plaintiff has *two claims* pending before the Court.  The first claim is a Title VII claim ....   The second claim is a 42 U.S.C. § 1983 claim ...." (emphasis added)). Defendants later wrote that Simmons "did not assert a claim for FMLA retaliation in her complaint."  Defs.' Rep. (Doc. 64) at 14.  And, indeed, Simmons's *initial* summary of her claims, entitled "Nature of this Action," does not mention the FMLA.  Complaint (Doc. 1) at 1-2.  But the final part, entitled "Third Federal Cause of Action," clearly does.  *Id.* at 11-12.  Perhaps realizing belatedly that this part exists, ASU and Wilson added a short section to their reply brief seeking to incorporate their other arguments in support of summary judgment on Simmons's FMLA claim.  *See* Defs.' Rep. (Doc. 64) at 15.

ASU and Wilson's failure to identify and discuss Simmons's third claim, in both their motion and accompanying brief, prevents an entry of summary

judgment in their favor.[8]   Pursuant to Federal Rule of Civil Procedure 56(a), a party seeking summary judgment must "identify[] each claim ... on which summary judgment is sought."   If the moving party fails to do so, a court may grant a summary-judgment motion "on grounds not raised by a party" only "[a]fter giving notice and a reasonable time to respond."   Fed. R. Civ. P. 56(f); *see also Gentry v. Harborage Cottages-Stuart, LLLP*, 654 F.3d 1247, 1261 (11th Cir. 2011).

The court thus denies summary judgment on Simmons's FMLA claim at this time.   However, the court has previously granted ASU and Wilson's related motion, allowing them to file a renewed motion for summary judgment.   *See* Order (Doc. 69).   The court will reconsider summary judgment as to Simmons's FMLA claim once an appropriate motion and briefing are filed.

------

8. ASU and Wilson's effort to address this issue in their reply brief does not remedy the error.   *Cf. Park City Water Auth., Inc. v. N. Fork Apartments, L.P.*, 2009 WL 3425674, at *6 n.15 (S.D. Ala. 2009) (Steele, J.) ("Having been raised for the first time in reply, the argument will not be considered.").

31

IV.   CONCLUSION

Accordingly, it is ORDERED that:

(1) Defendants Alabama State University and Wilson's motion for summary judgment (Doc. 48) is granted in part and denied in part.

(2) Said motion is granted only as to plaintiff Sabine Simmons's first two claims under Title VII and § 1983.   Summary judgment is entered in favor of defendants Alabama State University and Wilson and against plaintiff Simmons on these two claims, with plaintiff Simmons taking nothing as to these two claims.

(3) Said motion is denied as to plaintiff Simmons's third cause of action under the FMLA, albeit with leave to renew by defendants Alabama State University and Wilson in accordance with the court's previous order.

This case is not closed.

DONE, this the 3rd day of August, 2021.

/s/ Myron H. Thompson
UNITED STATES DISTRICT JUDGE